## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

KENNETH SAINTES                    CASE NO.  6:24-CV-01604

VERSUS                             JUDGE ROBERT R.
                                   SUMMERHAYS
SOCIAL SECURITY                    MAGISTRATE JUDGE CAROL B.
ADMINISTRATION                     WHITEHURST

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, the Court recommends that the Commissioner's decision be reversed and remanded for further administrative action.

## Administrative Proceedings

Claimant, Kenneth Saintes, fully exhausted his administrative remedies before filing this action in federal court. He filed an application for disability insurance benefits, alleging disability beginning on December 31, 2020. His application was denied. He then requested a hearing, which was initially held on June 22, 2023, before Administrative Law Judge Stephanie Smoke. (Rec. Doc. 6-1, p. 71). A supplemental hearing was held on April 11, 2024. (Rec. Doc. 6-1, p. 45). The ALJ issued a decision on May 1, 2024, concluding that Claimant was not disabled within the meaning of the Social Security Act from the claimed disability

onset date through the date of the decision. (Rec. Doc. 6-1, p. 19-35). Claimant requested that the Appeals Council review the ALJ's decision, but the Appeals Council found no basis for review. (Rec. Doc. 7). Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of judicial review. *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005). Claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Claimant was born on August 21, 1969. He was 51 years old on the alleged disability onset date and 54 years old at the time of the ALJ's decision. Claimant has a high school education. (Rec. Doc. 6-1, p. 83). He worked as a truck driver from at least 2008 to the time of disability in 2020. His job entailed driving large trucks and moving hoses for industrial material. In December 2020, he contracted Covid and pneumonia and was unable to work thereafter. (Rec. Doc. 6-1, p. 85-90). Since then, he has taken oxygen daily. (Rec. Doc. 6-1, p. 90). He experiences memory loss, diagnosed as Covid dementia, which affects his ability to drive. (Rec. Doc. 6-1, p. 92; 97-98). He has had three hip surgeries, including a defective replacement hip joint. (Rec. Doc. 6-1, p. 93). He walks with a cane, can only stand for about ten minutes, walk for about thirty minutes, and must do household chores very slowly, with no yardwork. (Rec. Doc. 6-1, p. 62; 94-96; 99). He also suffers from back pain

and "discs that slip all the time," (Rec. Doc. 6-1, p. 96), as well as atrial fibrillation and swelling legs due to cardiac issues (Rec. Doc. 6-1, p. 62; 98-99)

The medical records in the record reveal the following pertinent history:

- Primary care Dr. Roland Degeyter (869)

- In February 2010, Claimant presented Dr. Seth Rosenzweig with a one-year history of increasing left groin pain with any movement. He noted an Achilles tendon surgery in June 2008. Pelvis xrays demonstrated dysplastic hips with the same amount of flattening, left greater than right with no signs of obvious collapse yet of the femoral head. He also had osteopenic changes of the left ischium at the insertion and vascular clips seen in the scrotum. He was diagnosed with dysplastic synovitis. They first tried hip injections. He was not a candidate for hip arthroscopy due to the amount of wear. He underwent a total left hip replacement in November 2010 in which Dr. Rosenzweig used a Stryker product, known to be good with wear for a young individual such as Claimant. By January 2011, he was doing well with a lot of aggressive activities and "great" xrays. (Rec. Doc. 6-1, p. 657-67).

- Claimant returned to Dr. Rosenzweig in March 2012 with a new problem, left hand numbness and shoulder pain after raking. Xrays were essentially normal, and Dr. Rosenzweigh assessed shoulder inflammation with radiculopathy consistent with a cervical lesion versus maybe a double crush of the hand. Three months later, he was still having some shoulder issues and more burning in his neck when he looked down. He was given an injection for heel pain and tendinosis and eventually diagnosed with plantar fasciitis and Achilles tendinosis. In December 2012, he was also having right knee pain and had an injection for right patellar tendinitis In June 2013, he had a right intermetacarpal ligament injury to his hand after lifting some crawfish and was given another injection. (Rec. Doc. 6-1, p. 668-72).

- He returned to Dr. Rosenzweig with left hip pain in February 2014. He was not really having any left hip problems but was concerned about the fact that he had the Rejuvenate hip, which had been recalled by Stryker. He was very concerned about possible high metal ions from the hip, and tests were ordered to assess his metal levels. When he returned in August 2014, he was having pain in his thigh and hip. His xrays were unchanged, but Dr. Rosenzweig assessed a failing left total hip replacement. Though they did not have metal ion tests back, Claimant

was very anxious to have the stem removed. Dr. Rosenzweig did the left total hip revision in October 2014, taking out the implant and placing a long modular component. By November 2014, Dr. Rosenzweig stated that Claimant would not be able to return to driving truck until twelve weeks out from the intensive hip surgery. He had not seen any gross metallosis during the time of surgery, though there could have been some within the tissue. In January 2015, Dr. Rosenzweig released him to return to work as a driver with no restrictions. He was walking with a minimal detectable limp and no antalgia. He had a well-healed osteotomy and well-placed long stem. Dr. Rosenzweig hoped he could get 20 to 30 years from the replacement. (Rec. Doc. 6-1, p. 673-80)

- In March 2015, Claimant returned to Dr. Rosenzweig. Though fully recovered from the left hip surgeries, he was having right knee pain, catching in his right hip, and left arm numbness. Dr. Rosenzweig assessed end-stage arthrosis in the right hip, similar to what he had on the left, with referred knee pain, left rotator cup syndrome, and radiculitis. In December 2015, he underwent right hip replacement due to avascular necrosis. By that point, he was past stage 3, with clicking, pain, discomfort and burning and was unable to drive his truck. He had been on a walker and cane. Following the surgery, he experienced swelling and hematoma/seroma. Though he had been doing well by February 2016, he experienced a rectus or sartorious tear after an incident with his dog. By April 2016, he was still having pain and received an injection. Dr. Rosenzweig advised that some men could take six to nine months for their thigh to acclimate to the stem. (Rec. Doc. 6-1, p. 681-92).

- Claimant returned to Dr. Rosenzweig in September 2018 following a right ankle injury and with continued bilateral shoulder pain. He was not walking with assistive devices at this point. He received an injection for a probable small cuff tear and biceps tendinosis. His ankle was just synovitis. He was having continued left ankle pain in February 2019, at which time Dr. Rosenzweig suggested he was having dependent lymphatic swelling secondary to two hip replacements. They discussed a low-dose diuretic and compression hose for swelling. (Rec. Doc. 6-1, p. 693-702).

- In June 2019, Claimant presented to Dr. Rosenzweig with severe, burning lower back pain following an injury. Dr. Rosenzweig diagnosed significant spondylosis and L5-L3 radiculitis for which he prescribed a Dosepak, valium and Percocet. He returned in November 2019 with sharp right shoulder and elbow pain and was assessed with having biceps tendinitis, possibly a small cuff tear, and acute tennis elbow for which he was given an elbow strap and a tendon injection. By the

4

follow up visit in July 2020, he was not on pain meds but was still having pain. He was struggling with tendonitis in both biceps, and Dr. Rosenzweig believed he probably had a right cuff tear. They would eventually get an MRI, but they did a tendon injection until surgery could be discussed (post-Covid). In September 2020, following an MRI of his right shoulder, Dr. Rosenzweig diagnosed significant acromioclavicular joint spurring and biceps fluid, though the rotator cuff was intact. They discussed an arthroscopic Mumford decompression procedure but proceeded with another injection for the time. (Rec. Doc. 6-1, p. 703-13).

- Claimant returned to Dr. Rosenzweig in March 2021 for ongoing bilateral hip pain with stiffness and weakness. He was no longer working. The physical exam showed antalgic gait, with normal hip tests and strength and pain reproduced in the groin with restricted range of motion particularly with internal rotation. Exam of other body parts were normal. He was diagnosed with right trochanteric bursitis and given an injection. Dr. Rosenzweig opined Claimant had some deconditioning after having Covid, injected both bursa, and prescribed home therapy. At the next follow up in July 2021, he was having worse pain in his left hip and presented again with antalgic gait. Dr. Rosenzweig concluded that his history of avascular necrosis in his 30s and past hip replacements had resulted in his altered gait and chronic bursitis in both hips to the point he was unable to do household ambulation. He did not think Claimant needed any further hardware, but he stated that Claimant could not drive trucks or perform any medium duty work. He was unsure whether an FCE would qualify him for sedentary, but Dr. Rosenzweig noted that even sitting for prolonged periods of time aggravates his bursitis. He again performed a hip injection. (Rec. Doc. 6-1, p. 715-20).

- Claimant was admitted to Franklin Foundation Hospital on January 20, 2021, for Covid pneumonia, hypoxia, and dyspnea. He had tested positive for Covid on January 3, 2021, and developed fever, cough, shortness of breath, and fatigue with decreased pulse oxygen. Xrays upon admit show bilateral pulmonary infiltrates consistent with Covid pneumonia. He was discharged January 29, 2021. Follow up chest xrays in May 2021 showed resolution of bilateral pulmonary infiltrates with minimal scarring in the right lung. By June 2021, X-rays showed no evidence of acute disease. (Rec. Doc. 6-1, p. 535-65; 639-47).

- Claimant presented for a cardiology follow-up with Dr. David Daly in February 2021 for shortness of breath, palpitations, fatigue, weakness and edema in lower extremities. A Holter monitor showed PVCs with 3% ectopic burden and no

evidence of sustained arrhythmia or heart block. Dr. Daly prescribed metoprolol. (Rec. Doc. 6-1, p. 491-95; 578-85).

- In February 2021, neurologist Dr. Adam Foreman diagnosed Claimant with occipital neuralgia. He had complained of persistent occipital headaches since November 2020 with nausea, neck pain, and photosensitivity. By March 2021 notes show daily oxygen since having covid, mental fog with episodes of extreme confusion and word finding difficulty, and inability to multitask. He was diagnosed with post-covid encephalopathy and given Namenda. He slowly improving by May 2021, and a brain MRI was normal. (Rec. Doc. 6-1, p. 506-29).

- Robert LeJeune, D.C. provided a May 26, 2021 narrative statement which states that he is one of Claimant's primary physicians. He related Claimant's ongoing low back and bilateral hip conditions to a fall on a ship while serving in the military. Claimant's pain had worsened over time, with any kind of movement or activity to the point where he was disabled. He had also developed sleep apnea from weight gain due to lack of mobility. Dr. LeJeune opined that Claimant's spinal pain, resulting in hip degeneration and subsequent replacement was the result of a service-connected condition. (Rec. Doc. 6-1, p. 532).

- In the initial disability determination in September 2021, Dr. Denise Greenwood, state agency consultant, reviewed Claimant's medical records to that point and found he was capable of light work. (Rec. Doc. 6-1, p. 108-20). On reconsideration in July 2022, Dr. Paul Wilson, state agency consultant, affirmed that finding. (Rec. Doc. 6-1, p. 121-26).

- Claimant followed up with Dr. Foreman in November 2021 for occipital neuralgia and memory changes due to post-Covid encephalopathy. He reported being forced into retirement due to medical issues, causing some depression. He was still having short-term memory issues. His prescription for Namenda was increased, and he was instructed to follow up with his primary doctor for depression which was likely playing a role in the clinical picture. (Rec. Doc. 6-1, p. 760-61).

- In March 2022, Claimant followed up for trochanteric bursitis of the right hip with Dr. Rosenzweig's nurse practitioner, Brandy Molbert. Physical exam showed marked trochanteric tenderness with almost full range of motion with some pain at the extremes, antalgic gait, and otherwise normal tests. The provider

noted that for the most part Claimant was doing well but does have some chronic recurrent stiffness and mild discomfort in his hips, though he tried to remain fairly active and uses a cane when needed. His xrays looked stable. The provider again noted it would be difficult for Claimant to do a medium duty job. Claimant refused any formal physical therapy but would continue to do home exercises with an emphasis on maximizing mobility, weight loss, and avoiding climbing stairs, prolonged sitting or standing. He underwent bilateral injections of the bursa again and refused NSAIDs. (Rec. Doc. 6-1, p. 754-56).

- Claimant followed up with Dr. Foreman in May 2022, at which time he had no complaints of memory loss or occipital neuralgia. His diagnoses were chronic migraine without aura and long Covid. He reported his memory was good as long as he took Namenda, that his headaches were controlled with Topamax, he was only using oxygen at night, he had lost some weight, and felt back to normal. His physical exam showed his gait was narrow based with normal stride length. He was able to walk on heels, toes, and in tandem. (Rec. Doc. 6-1, p. 768-72)

- Dr. Rosenzweig provided a medical source statement on July 27, 2022, in which he provided that Claimant has the following medical issues: chronic hip pain, stiffness, and limitation of motion, bony destruction of hip, inability to ambulate effectively, and history of reconstructive surgery or surgical arthrodesis of hip and ability to ambulate effectively did not return, or is not expected return within 12 months of onset. He provided that Claimant could only sit for 15 minutes at a time and otherwise never stand at one time, lift occasionally or frequently, or climb ladders or stairs. He could occasionally bend, stoop, and balance. He concluded that Claimant could not perform sedentary duty on a full-time basis. (Rec. Doc. 6-1, p. 775-76; related medical records at 858-61).

- In a September 2022 cardiology follow up, Claimant complained of palpitations, dyspnea on exertion, and edema. Dr. Daly adjusted his medications. His calcium test showed minimal identifiable plaque and a very unlikely risk of coronary artery disease. (Rec. Doc. 6-1, p. 780-84; 795).

- Claimant has treated with Dr. Kidd for optic neuritis and spots in his vision since 2013. In July 2021 Dr. Milton Kidd diagnosed Claimant with nuclear sclerotic cataracts with vitreous floaters and optic neuritis. He was referred for neuro-ophthalmology consult. (Rec. Doc. 6-1, p. 732-46). Most recently in September 2022, Dr. Kidd referred him to Dr. Frank Culotta, who recommended continued management with Dr. Kidd. (Rec. Doc. 6-1, p. 826-42).

- Claimant returned to Dr. Rosenzweig in December 2022, for worsening bilateral hip pain and stiffness. The physical exam remained relatively the same, with marked trochanteric tenderness and almost full range of motion with pain at the extremes. He had significant tenderness throughout the lateral trochanters and into the groin, with 4/5 strength in his left hip. Dr. Rosenzweig noted problems with deep hip flexion and pain on both trochanters with antalgic gait. The impression remained as trochanteric bursitis, and another injection was administered. Dr. Rosenzweig stated that Claimant had attempted to remain in the work force, but that became inhibitive because of the inability to climb up in and out of the truck. For the prior two years, he struggled with even sitting for prolonged periods of time more than 15 minutes. They had maximized his medical treatment with surgeries, therapy, weight loss, injections and ambulatory aids. Dr. Rosenzweig thought it was "futile to continue pushing him into these activities when as a highly motivated individual, he has proven that these are too difficult for him to perform." Despite multiple hip surgeries, chronic recurrent stiffness and moderate chronic discomfort, he tried to remain fairly active, using a cane when needed. No further surgeries were contemplated. Dr. Rosenzweig concluded he was disabled from even sedentary work because of his inability to sit more than 15 minutes at a time without having to change positions. He had chronic tendinosis most likely from some of the metal shedding from the recalled total hips. Although he had lost 50 pounds, Dr. Rosenzweig did not believe Claimant could engage in meaningful employment even in a sedentary capacity because of his inability to sit. (Rec. Doc. 6-1, p. 851-53).

- Dr. Rosenzweig provided a medical source statement in March 2023, which provided that Claimant can stand/walk for a total of one hour and sit for one hour during an 8-hour workday, and is restricted to lifting and carrying less than ten pounds. For routine ambulatory activities, Claimant required a cane, walker, or crutches. He is incapable of performing full-time work activity even at the sedentary level. (Rec. Doc. 6-1, p. 957-59).

- May 2023 updates from Dr. Foreman indicate ongoing chronic migraine with new complaints of lightheadedness/dizziness, one episode of mild loss of conscience, and tinnitus. Dr. Foreman noted that his memory was not better and he suffered from positional dizziness apparently related to dehydration. Dr. Foreman recommended that he increase exercise and adjusted his medications. (Rec. Doc. 6-1, p. 961-64).

- In October 2023, Claimant again had bilateral bursa injections for ongoing hip pain. (Rec. Doc. 6-1, p. 976). The November 2023 update indicates ongoing pain

at 8/10 with an unchanged physical exam. He had recently felt a tearing sensation in his abdomen and had fluid into his thigh in knee. Dr. Rosenzweig opined he had suffered an umbilical hernia and should see a general surgeon. (Rec. Doc. 6-1, p. 972-75) (Rec. Doc. 6-1, p. 966-67; 1007-13; 1028 regarding umbilical hernia).

- A January 2024 xray of Claimant's right knee showing mild medial knee degenerative changes and superior patellar enthesopathy. (Rec. Doc. 6-1, p. 1051).

- Dr. Degeyter, Claimant's primary care doctor, provided a medical source statement in February 2024, which provided that Claimant can stand/walk for a total of two hours and sit for two hours during a workday. Like Dr. Rosenzweig, Dr. Degeyter agreed he was restricted from lifting/carrying more than ten pounds. Unlike Dr. Rosenzweig, he stated that Claimant should elevate his foot above the heart due to his total hip replacements and that Claimant could use his upper extremities very little. He agreed that Claimant needed a cane. Due to Claimant's diagnoses of post-covid syndrome, sleep apnea requiring supplemental oxygen, osteoarthritis, joint replacements, and mild cognitive impairment, Dr. Degeyter concluded Claimant was totally disabled from doing even sedentary work. (Rec. Doc. 6-1, p. 968).

- Most recently, in March 2024, Claimant followed up with Dr. Daly and advised of a couple of syncope episodes over the prior two to three months, usually on exertion. He also had increased edema of his legs. (Rec. Doc. 6-1, p. 1147).

After considering the foregoing records and testimony from Claimant and at least two vocational rehabilitation experts, the ALJ concluded Claimant was capable of performing light duty work, subject to certain physical restrictions, and that a significant number of qualifying jobs exists in the national economy, such that Claimant was not disabled. (Rec. Doc. 6-1, p. 19-35). Claimant now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id*. (citations omitted).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173. A court must carefully examine the entire record but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner. *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022. Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Wren v.*

*Sullivan*, 925 F.2d 123, 126 (5ᵗʰ Cir. 1991). Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience. *Wren v. Sullivan*, 925 F.2d at 126.

### B.   Entitlement to Benefits

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. See 42 U.S.C. § 423(a).  See also *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019). Supplemental Security Income SSI provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. 42 U.S.C. § 1382(a)(1) & (2).  See also *Smith v. Berryhill*, 139 S.Ct. at 1772. A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if his physical or mental impairment or impairments are so severe that he is unable do his previous work and considering his age, education, and work experience, cannot participate in any other kind of

substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

### C.    Evaluation Process and Burden of Proof

A sequential five-step inquiry is used to determine whether a claimant is disabled.  The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work. 20 C.F.R. § 404.1520.

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work. 20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can

12

perform other substantial work in the national economy. *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302. If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

### D. <u>The ALJ's Findings and Conclusions</u>

The ALJ determined at step one that Claimant has not engaged in substantial gainful activity since December 31, 2020. This finding is supported by substantial evidence in the record.

At step two, the ALJ found that Claimant has the following severe impairments: trochanteric bursitis, right hip; fracture of the lower limb, respiratory disorder, and osteoarthritis. (Rec. Doc. 6-1, p. 22). This finding is mostly supported by substantial evidence in the record. The Court questions whether "fracture of lower limb" applies to this case, but Claimant did not challenge the ALJ's finding in this

regard, and as discussed below, this purported impairment is not determinative in this case. The Court further finds the ALJ erred in failing to recognize severe impairments in both hips, as shown by substantial medical evidence; however, the ALJ's analysis after step three does consider Claimant's impairments in both hips, so the error is harmless.

At step three, the ALJ found that Claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Rec. Doc. 6-1, p. 23). Claimant does not challenge this finding.

In assessing Claimant's residual functional capacity, the ALJ found Claimant is capable of performing light work, except he can never climb ladders, ropes, and scaffolds; occasionally climb ramps and stairs; occasionally stoop, kneel, and crouch; should avoid concentrated exposure to fumes, odors, gases, and poor ventilation; and should avoid all exposure to hazards, such as moving mechanical parts, unprotected heights, and vibrations. (Rec. Doc. 6-1, p. 23). Claimant challenges this finding.

At step four, the ALJ found Claimant was unable to perform past relevant work. (Rec. Doc. 6-1, p. 33). Claimant does not challenge this finding.

At step five, the ALJ found that, considering Claimant's residual functional capacity (RFC), age, education, and work experience, Claimant is able to perform a

significant number of available qualifying jobs, such that he is not disabled. (Rec. Doc. 6-1, p. 34). Claimant challenges this finding.

### E.    The Allegations of Error

Claimant alleges the ALJ erred in assessing a light RFC and in dismissing the opinions of his treating physicians in favor of opinions from non-treating evaluators.

### F.    Whether the ALJ erred in assessing a light RFC.

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record." *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).The ALJ is responsible for determining a claimant's residual functional capacity. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations. *Martinez v. Chater*, 64 F.3d at 176. The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983). In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be

15

accepted as consistent with the objective medical evidence and other evidence. The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe. *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

After reviewing Claimant's extensive medical records, the ALJ disregarded Claimant's use of a single prong cane and rejected his long-time treating physicians' medical findings and opinions. Claimant challenges the ALJ's conclusion accordingly.

### 1. **Claimant's Use of a Cane**

The medical evidence is consistent with Claimant's testimony that he requires the assistance of a cane due to his hip issues. (Rec. Doc. 6-1, p. 851-53; 858; 958; 968). The ALJ ignored extensive relevant *orthopedic* records showing that Claimant used a cane and maintained an antalgic gait favoring the affected side, with limited hip strength. (e.g. p. 715-20; 852; 860). Instead, the ALJ relied on medical records unrelated to orthopedic issues noting a normal gait. (Rec. Doc. 6-1, p. 32, referencing family doctor's records pertaining to visits for headache and sore throat at p. 869-73; cardiology records at p. 1178-79; and neurologist records pertaining to sleep apnea at p. 1047). The ALJ erred in failing to consider Claimant's well- supported medical need for a cane.

Claimant points to SSR 96-9p, which indicates that the use of a hand-held assistive device limits one to sedentary work due to the use of one's hand to aid in walking or standing. Claimant further relies on SSR 83-10, which defines light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. "Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing—the primary difference between sedentary and most light jobs." *Id*.

Dr. Rosenzweig concluded in his July 2022 medical source statement that Claimant's ability to stand at one time was "none," and his ability to sit was limited to 15 minutes, with no ability to lift occasionally or frequently, such that he was incapable of performing even sedentary work. (Rec. Doc. 6-1, p. 775). In a March 2023 medical source statement, Dr. Rosenzweig advised that he could stand and/or walk for a total of 1 hour during a work day, sit for a total of 1 hour during a work day, and lift/carry less than 10 pounds during a work day, and that he required an ambulatory device for routine ambulatory activities. (Rec. Doc. 6-1, p. 957-58). Claimant's primary care doctor, Dr. Degeyter, agreed. (Rec. Doc. 6-1, p. 968-69). The Court agrees that the ALJ erred in failing to consider Claimant's need for an assistive ambulatory device in assessing Claimant's RFC. Instead the ALJ formulated her own medical conclusion based on ancillary notes in unrelated records.

17

## 2. **Treating Physicians' Opinions**

Claimant next argues the ALJ erred in disregarding his treating physicians' opinions and instead erroneously relied on the initial state agency's opinion following its review of records. The ALJ's duty to weigh medical opinions is governed by 20 C.F.R. 404.1520c. Although an ALJ is no longer required to give controlling weight to a treating physician's medical opinions, the regulations state that "[w]hen a medical source provides one or more medical opinions…, we will consider those medical opinions … from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." 20 C.F.R. § 404.1520c(a). The factors to be considered are the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and any other factor which the claimant brings to the court's attention. 20 C.F.R. § 404.1520c(c)(1-5). The two most important factors are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). With regard to supportability, the regulation states that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)…, the more persuasive the medical opinions…will be." 20 C.F.R. § 404.1520c(c)(1). With regard to consistency, the regulation states that "[t]he more consistent a medical opinion(s) … is with the evidence from other

medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2). Thus, the ALJ was required to consider all of the medical opinions, focusing primarily on the supportability and consistency of each opinion.

The Court finds the ALJ erred in disregarding Dr. Rosenzweig in favor the state agency consultants' opinions. Dr. Rosenzweig has treated Claimant since at least February 2010. He performed three hip replacements and routinely followed Claimant's condition. His opinion that Claimant is incapable of performing even sedentary work is entitled to significantly more weight than a non-examining, state agency doctor's conclusion drawn from mere review of medical records. The Court finds that Dr. Rosenzweig's opinions are consistent with the entire medical record and Claimant's testimony and should govern the determination of disability.

## Conclusion and Recommendation

For the foregoing reasons, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to again evaluate the claimant's residual functional capacity, and to specifically consider whether Claimant qualifies for a sedentary RFC in light of his need for a cane and Dr. Rosenzweig's opinions. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection

herewith will be a "final judgment" for purposes of the Equal Access to Justice Act ("EAJA").[1]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[2]

---

[1]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

[2]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).

Signed in Lafayette, Louisiana, this 25th day of June, 2025.

_____
CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE